894 A.2d 518

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Candace K. CALHOUN.**

**Misc. Docket AG No. 57, September Term, 2004.**

Court of Appeals of Maryland.

March 9, 2006.

534

538

Dolores O. Ridgell, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel, Atty. Grieance Com'n), for petitioner.

Candace K. Calhoun, Frostburg, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

CATHELL, J.

Pursuant to Maryland Rule 16–751[1] of the Maryland Lawyers' Rules of Professional Conduct (MRPC),[2] the Attorney Grievance Commission (the "Commission" or "Bar Counsel"), acting through Bar Counsel, filed a petition for disciplinary action or remedial action against Candace K. Calhoun, Esquire ("Respondent"), charging her with violations arising out of her representation of Mr. Paul E. Schell. With respect to the MRPC, the petition alleged that respondent violated Rules 1.1 (Competence),[3] 1.3 (Diligence),[4] 1.4 (Communication),[5] 1.5

---

1. Maryland Rule 16–751 provides in pertinent part:

 "(a) **Commencement of disciplinary or remedial action.** (1) Upon approval of Commission. Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals."

2. This Court adopted a new version of the Maryland Lawyer's Rules of Professional Conduct, effective 1 July 2005. The MRPC sections applicable to this case are substantially similar to the sections they replaced. The MRPC sections quoted indicate the language in effect at the time the charges were brought, i.e., prior to the 2005 version.

3. Rule 1.1 provides:

 "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

4. Rule 1.3 provides:

 "A lawyer shall act with reasonable diligence and promptness in representing a client."

5. Rule 1.4 provides:

 "(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
 (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

(Fees),[6] 1.15 (Safekeeping Property),[7] 8.1 (Bar Admission and

---

6. Rule 1.5 provides in pertinent part:
 "(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
 (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
 (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
 (3) the fee customarily charged in the locality for similar legal services;
 (4) the amount involved and the results obtained;
 (5) the time limitations imposed by the client or by the circumstances;
 (6) the nature and length of the professional relationship with the client;
 (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
 (8) whether the fee is fixed or contingent.
 (b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.
 (c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. The terms of a contingent fee agreement shall be communicated to the client in writing. The communication shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination."

7. Rule 1.15 provides:
 "(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own personal property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
 (b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted

Disciplinary Matters),[8] 8.4(a), 8.4(c), 8.4(d) (Misconduct)[9] and Maryland Rule 16–609 (Prohibited Transactions)[10] as adopted by Maryland Rule 16–812.

Pursuant to Maryland Rule 16–752(a),[11] we referred the matter to Judge Frederick C. Wright, III of the Circuit Court

---

by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved."

8. Rule 8.1 provides:
"An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
(a) knowingly make a false statement of material fact; or
(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6."

9. Rule 8.4 provides in pertinent part:
"It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
. . .
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
(d) engage in conduct that is prejudicial to the administration of justice; . . . ."

10. Maryland Rule 16–609 provides:
"An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer."

11. Maryland Rule 16–752(a) states:
"(a) **Order.** Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a

for Washington County for an evidentiary hearing and to make findings of fact and conclusions of law in accordance with Maryland Rule 16–757(c).[12] On July 15, 2005, Judge Wright held a hearing and on September 21, 2005, issued findings of fact and conclusions of law, in which he found by clear and convincing evidence that respondent had violated MRPC 1.1, 1.3, 1.4, 1.5, 1.15, 8.4(a), (c), (d) and Maryland Rule 16–609. Respondent, pursuant to Maryland Rule 16–758(b),[13] filed exceptions to Judge Wright's findings.

## I.

The charges in this matter arose out of respondent's representation of Mr. Schell in a sexual harassment action. Judge Wright made the following factual findings and conclusions of law, dictating them into the record pursuant to Rule 16–757(c):

"I'm going to start with the petition because the allegations are averments that[ ] . . . if proven by clear and convincing evidence, then would be applied to the various rules of ethics that [Bar Counsel] alleges had been violated by Ms. Calhoun. Then I'm going to go back and spend some time in another review of the record to indicate why I feel there is supporting evidence of the various averments that are in the petition.

judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing."

12. Maryland Rule 16–757(c) provides in pertinent part:
"(c) **Findings and conclusions.** The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed."

13. Maryland Rule 16–758(b) provides in pertinent part:
"(b) **Exceptions; recommendations.** Within 15 days after service of the notice required by section (a) of this Rule, each party may file (1) exceptions to the findings and conclusions of the hearing judge and (2) recommendations concerning the appropriate disposition under Rule 16–759(c)."

. . .

"And I would find from a review of the proceedings on July the fifteenth and considering your respective proposals and argument that the Attorney Grievance Commission has met its burden of proving by clear and convincing evidence that the respondent was admitted to the Bar of the Court of Appeals of Maryland on June 25, 1997. Respondent was also admitted to the bars of West Virginia and Pennsylvania.

"During times relevant to this petition, Ms. Calhoun maintained an office for the practice of law in Cumberland, Maryland. On or about . . . May of 1999 Paul Schell consulted Ms. Calhoun concerning an employment related matter. Ms. Calhoun, the respondent, advised Mr. Schell that he had a claim against his former employer for sexual harassment.

"In May of 1999 the respondent was engaged by Mr. Schell to represent him with regard to his claim against his former employer. The attorney and client then entered into a representation agreement.[14] The terms of which were communicated to the client in writing.

---

**14.** The representation agreement between respondent and Mr. Schell provides, in pertinent part:

"In general, I will incur various costs and expenses in performing legal services under this agreement. You must agree to pay for those costs and expenses in addition to the legal fees on a monthly basis. Legal fees will be calculated on the following:
I WILL REQUIRE A $5,000.00 RETAINER TO INITIATE LEGAL SERVICE.
I WILL CHARGE FOR MY TIME IN MINIMUM AMOUNTS OF 1/10 HOUR AT $150.00 AN HOUR.
IN THE EVENT THIS MATTER IS SUCCESSFULLY LITIGATED, THE APPLICABLE FEE WILL BE **THE GREATER** OF THE TOTAL HOURLY LEGAL SERVICE FEE PLUS 20% OF ANY MONETARY RECOVERY OR 40% OF ANY MONETARY RECOVERY.
IN THE EVENT THIS MATTER IS NOT SUCCESSFULLY LITIGATED, THE APPLICABLE FEE WILL BE THE TOTAL HOURLY LEGAL SERVICE FEE, WHICH DOES NOT INCLUDE OUT OF POCKET COSTS AND EXPENSES. COSTS AND EXPENSES WILL BE CHARGED IN ADDITION TO THE SUCCESS OR FAILURE OF THE LITIGATION OF THIS ACTION.

"The agreement called for a retainer of Five Thousand Dollars to be earned at the rate of a Hundred and Fifty Dollars per hour and represented that the final fee would be if the matter was successfully litigated the greater of the total hourly fee plus twenty percent or forty percent of any monetary recovery.

"The agreement also represented that if the matter was not successfully litigated the attorney would receive an hourly fee. The agreement is silent as to what would be considered a successful litigation.

"This agreement was prepared, of course, by Ms. Calhoun as an attorney, professional, and she's expected to know what the expectations of a client are in any type of employment between the two of them. So the terms of this employment contract, if you will, were best known to Ms. Calhoun as to what they meant. And there was no further explanation, I guess, made by Ms. Calhoun to Mr. Schell as to what successful litigation is. Does that successful litigation mean day in court, verdict for plaintiff? Successful litigation mean settlement prior to that date?

"Recovery by way of settlement can certainly be successful as far as the client is concerned. Now Mr. Schell had no idea what successful litigation meant. Those are terms that are legal.

"The agreement called for the complainant, Mr. Schell, to pay all litigation costs. The agreement stated that Ms. Calhoun would provide monthly statements to her client after the Five Thousand Dollar retainer was depleted.

"*Respondent, however, failed to provide the expected monthly statements.* Now I know there is a conflict as to whether certain statements were, in fact, sent. Mr. Schell indicated he didn't receive anything until, I believe, March

---

Costs and expenses commonly include filing fees, court reporter fees, long distance telephone call fees, postage, photocopies, faxes, subpoenas, depositions and other out of pocket costs and expenses. You must also agree to pay, if necessary, transportation and will be charged the hourly rate for the time the attorney spends traveling."

of 2003. Ms. Calhoun and her witness indicated that certain statements were, in fact, sent on a monthly basis.

"I am not making any finding of fact as to whether these statements were or were not sent. *I'm assuming that they were sent. But they are certainly, again, not what would have been expected in any attorney/client relationship to meet the agreement or contractual definition of monthly statements.*

"The control is in the hands of the attorney. And there is an expectation, I believe, that in this situation any monthly statements would have been detailed indicating fees earned, costs paid in furtherance of litigation as charges and then a statement as to monies paid by client, received by counsel to be applied to fees earned. That was not done. So there's a failure of Ms. Calhoun to provide the expected monthly detailed statements.

"On or about May nineteen, 1999 Mr. Schell paid Ms. Calhoun a Five Thousand Dollar retainer. On or about June the eighth, 2001 the respondent represented to Mr. Schell that he had funds left in his retainer but an additional payment of Five Thousand Dollars would be necessary to cover the costs of depositions. And I would find that [ ] is sustained by clear and convincing evidence that there was a discussion between Ms. Calhoun and Mr. Schell that she needed an additional Five Thousand Dollars to cover costs of depositions that had not yet occurred.

"Then . . . on or about June the eighth, the complainant, Mr. Schell paid Ms. Calhoun this other Five Thousand Dollars. *Ms. Calhoun failed to deposit the funds received from Mr. Schell in a properly designated attorney trust escrow account.*

"Respondent continued to represent Mr. Schell through-out the years of 1999, 2000, 2001, 2002. So the attor-ney/client relationship continued. When we say represent that means that the attorney/client relationship continued during those years and there were, again, expectations by Mr. Schell that what Ms. Calhoun would be doing would be

beneficial to him ... hopefully leading to a successful conclusion of the litigation.

"In April of 2000 Ms. Calhoun filed a charge of discrimination with the Equal Employment Opportunity Commission. A right to sue was issued. Then [on] August eleventh of 2000 respondent filed a complaint in the United States District Court for Maryland, which alleged that the former employer had engaged in discrimination based on sex and sought Seven Million Dollars in damages.

"Again, it's shown by clear and convincing evidence that during this time of representation and attorney/client relationship in the movement of and responsibility of the attorney to move the litigation forward to ... or the conflict forward to successful conclusion and the expectation that whatever an attorney does and bills another person for, it is not just spending of time that one can assess against somebody, it is doing something that's productive. *However, during this period Ms. Calhoun failed to interview or depose any potential witness.*

"*There was no interviewing, no investigation by Ms. Calhoun, as attorney, with the expected knowledge as to what has to be proven to sustain a claim in Federal court for discrimination.* She's the one that is expected by a client in this situation; it's the attorney who's expected to be the knowledgeable person as to what evidence, what type of presentation is necessary. *Yet, she did not interview any potential witness.*

"*Also, during the representation Ms. Calhoun failed to keep Mr. Schell informed concerning the accrual of fees.* Again, not found by this Court to be detailed statements that would be expected to be understood by a layman as to the accrual of fees.

"*During the representation I would find by clear and convincing evidence, Ms. Calhoun did mislead Mr. Schell concerning amounts owed and the manner in which she applied the payments.* There are many ways to mislead. One can mislead by what one says. One can mislead by

what one does. And one can mislead by silence and lack of communication.

"Mr. Schell was mislead [sic] in his expectations as to what he's paying for, what services he was paying for-how they were to be ... how they were actually accomplished, what was being done. The client has I would say [a] right but certainly I talk about expectations and I'm using that term as a right in the administration of justice and relationships between attorneys and client. The client has to be made aware on a regular basis as to the status of one's case and the status of one's monetary expectations, costs.

*"During the representation Ms. Calhoun failed to keep Mr. Schell informed concerning the accrual of litigation costs for which he was responsible.*

"On or about November, 2001–now we're getting to the matter of the settlement, Ms. Calhoun recommended that Mr. Schell accept an offer of Eight Thousand Dollars to settle the case. Again, advice, providing advice to one's client. Ms. Calhoun advised Mr. Schell to settle for Eight Thousand Dollars.

"However, she did not advise Mr. Schell that fees had accrued in excess of that amount. Based on the advice and recommendations [ ] Mr. Schell agreed to accept the offer. But he didn't do it with full knowledge of how Ms. Calhoun was going to apply the Eight Thousand Dollars.

"A settlement is a settlement ... is an agreed conclusion of litigation. And I would find that Mr. Schell was unaware when he accepted an Eight Thousand Dollar settlement that he was going to owe Ms. Calhoun any more monies but for any costs of litigation that may have been expended.

"It can be argued that any settlement is successful litigation. And I think to the lay person, incidentally to one who's a mechanic, he felt that his litigation was successful in settling for Eight Thousand Dollars. He didn't know that, in fact, it was so unsuccessful that he was going to get another bill, which is misleading. Again, ... the authority

and the power was with Ms. Calhoun, the power to inform and keep the client truthfully informed.

"February twentieth, 2002, on or about, a check was received and settlement papers were signed. But a check was received in the amount of Eight Thousand Dollars from the attorney representing the defendant in the Federal litigation.

"*Ms. Calhoun failed to deposit those funds, which were settlement funds, that were for the benefit of her client, failed to deposit those funds in a proper attorney trust escrow account. She deposited it instead into a personal account, a different account than the original Five Thousand or the second Five Thousand retainer, purely personal. Her home address, not even her office address, her home address on the account.*

"*So she co-mingled trust funds with personal funds. Ms. Calhoun failed to promptly account for the funds received and failed to advise Mr. Schell in a timely manner that she had disbursed the settlement funds to herself.*

"*And it was not until March of 2003 after many requests by Mr. Schell that Ms. Calhoun finally informed Mr. Schell of the paper trail,* I guess, of the Eight Thousand Dollars, where the Eight Thousand Dollars went and what she was going to apply it to. And included in this response was in essence a statement or bill for an additional Nine Thousand Five Hundred Dollars of fees for services and for costs.

"*The Court finds with clear and convincing evidence that Ms. Calhoun failed to keep Mr. Schell informed concerning the status of litigation.* And then with the March 2003 correspondence from Ms. Calhoun, as attorney, to her client, *she did attempt to collect funds . . . from Mr. Schell for which he was not responsible under the terms of the retainer agreement.*

"*I would find by clear and convincing evidence that the fees that were charged by way of this final March 2003 statement were excessive and unreasonable.* And that by these acts and admissions [or omissions] Ms. Calhoun has

violated certain Maryland Rules of professional conduct and Maryland Rules.

"[There is] ... clear and convincing evidence to support these conclusions of law:

"That she violated Rule 1.1, competence where a lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

"Throughout all of these rules the term is used as to reasonableness. *And I would find that there was a failure to reasonably provide the representation that was expected by Mr. Schell.*

"I would find that the clear and convincing evidence supports a violation of Rule 1.3, diligence. A lawyer shall act with reasonable diligence and promptness in representing a client.

"I would find that there is support by clear and convincing evidence of a violation of Rule 1.4, communication. Lawyers shall keep a client [ ] reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

"A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. *The events surrounding the settlement certainly would show that there's a substantial violation of Rule 1.4.*

"I would find by clear and convincing evidence there was a violation of Rule 1.5, fees. A lawyer's fee shall be reasonable. There's certain factors that are ... determinative of reasonableness.

"*It was unreasonable to charge the fees that were evidenced by the March 2003 statement.* Now there ... has to be a, I'll use the word reasonable again, but there has to be in the dialogue, communication, between a professional person, attorney at law, and one's client. There cannot be a

taking of advantage of. And I think that there was ... Mr. Schell was taken advantage of by Ms. Calhoun.

"*You can't ... build up fees and then recommend a settlement that is going to be used as a fund for fees that are built up and not being productive for the client.* You can't build up Ten/Fifteen Thousand Dollars in fees by just time. Charging somebody for one tenth of an hour or two tenths of an hour or three tenths of an hour or half an hour, whatever it might be, just because you spent time on it. Again, that's a matter of control by the individual attorney and the expectation is that attorneys are going to be honest in that they will be charging for work done to enhance the interests of one's client.

"So you can't have your cake and eat it, too, in this ... type of situation. You cannot say that ... I deserve these fees of Ten Thousand and Fifteen Thousand Dollars because I have spent time [o]n it. But then as part of my representation I've also advised my client to accept a small amount of money and then turn around and charge the client purely on time.

"This ... situation was successfully litigated when you have a settlement that is successful litigation as far as the client is concerned. And that's the important part.... [W]hat's important here is what the client expects. *So these fees were unreasonable. The fees that were charged to him were unreasonable.*

"*There was a failure and this is recognized, there was a failure of Rule 1.15 and that's the safekeeping of property by the deposits of the Five Thousand and the Five Thousand not into trust accounts but, most especially, the failure to deposit the Eight Thousand Dollars in a trust account, escrow account, and co-mingling with personal funds.* ... [Y]ou can't explain that away. Every attorney knows that.

"That is a requirement and there have been ... statements from the Court of Appeals in many, many, many, many cases about problems that attorneys get into when they co-mingle client's funds with their personal funds ...

or personal account. And this Eight Thousand Dollars was client funds, client money. It's expected to be client money.

*"All of [these ] violations lead to the conclusion that there was professional misconduct, a violation of 8.4.* Throughout this relationship between Ms. Calhoun as attorney and Mr. Schell as client . . . there was a failure to communicate properly. *Again, I think that he was taken advantage of and I guess it is best shown by the attempt to collect monies and to charge a late fee and interest when they were not really earned by the contract and I think that's misconduct because it is conduct that is prejudicial to the administration of justice and the expectation of attorney . . . of what we expect as professional conduct and ethics.*

*"Now I do not find by clear and convincing evidence that there was any false representation by Ms. Calhoun to bar counsel.*[15]

"There was a violation of Maryland Rule 16–609 that prohibited transactions. And I think that has been . . . accepted by Ms. Calhoun." [Emphasis added.]

Bar Counsel takes no exceptions to the hearing judge's findings of fact and conclusions of law and recommends disbarment. On October 27, 2005, respondent filed numerous exceptions to the hearing judge's findings, discussed *infra.*

## II.

### STANDARD OF REVIEW

 This Court has original and complete jurisdiction over proceedings involving attorney discipline. *Attorney Grievance Comm'n v. Zuckerman,* 386 Md. 341, 363, 872 A.2d 693, 706 (2005) (citing *Attorney Grievance Comm'n v. James,* 385 Md. 637, 654, 870 A.2d 229, 239 (2005); *Attorney Grievance Comm'n v. O'Toole,* 379 Md. 595, 604, 843 A.2d 50, 55 (2004)). The hearing judge's findings must be supported by clear and convincing evidence. *Zuckerman,* 386 Md. at 363,

---

15. MRPC 8.1.

872 A.2d at 706 (citing *Attorney Grievance Comm'n v. Gore,* 380 Md. 455, 468, 845 A.2d 1204, 1211 (2004)); Maryland Rule 16–757(b) ("The petitioner has the burden of proving the averments of the petition by clear and convincing evidence."). We will accept a hearing judge's findings of fact unless we find that they are clearly erroneous. *Attorney Grievance Comm'n v. Weiss,* 389 Md. 531, 545, 886 A.2d 606, 614 (2005); *Zuckerman,* 386 Md. at 363, 872 A.2d at 706. And any conclusions of law made by the hearing judge are subject to our *de novo* review. *Weiss,* 389 Md. at 545, 886 A.2d at 614; *Zuckerman,* 386 Md. at 363, 872 A.2d at 706.

## DISCUSSION

After a thorough review of the record we find that Judge Wright's findings of fact and conclusions of law are supported by clear and convincing evidence. Respondent asserts twenty-one separate exceptions: 1 and 2 concern due process rights, 3 through 17 are exceptions to findings of fact, and 18 through 21 are exceptions to both findings of fact and conclusions of law. We will address the exceptions, consolidating a number of them due to similar subject matter, and deny them.

### A. *Respondent's Exceptions Based on the Alleged Violation of Her Due Process Rights.*

*Exceptions 1 & 2:* Respondent contends that her constitutional right to due process of law was violated "by an ex parte communication which resulted in public charges being filed for disciplinary action based upon an erroneous recommendation by the Peer Review Panel ..." and "by the Peer Review Panel's failure to consider a Panel member's vote to dismiss all charges against Respondent." In addition, respondent asserts that both Maryland Rules 16–723 and 16–754(b) are "unconstitutional as [they] preclude[ ] enforcement of the ex parte rule which protects a party's constitutional rights."

Respondent claims that, during the Peer Review process, Bar Counsel communicated with a panel member or members via a letter and indicated that respondent had failed

to agree to a Conditional Diversion Agreement.[16] Respondent's contention that her due process rights were violated by such alleged ex parte communication at the peer review level of this proceeding is without merit. Maryland Rule 16–754(b) states that "[i]t is not a defense or ground for objection to a petition that procedural defects may have occurred during disciplinary or remedial proceedings prior to the filing of the petition." The Court discussed this issue in *Attorney Grievance Commission v. Harris*, 310 Md. 197, 528 A.2d 895 (1987), in which we found that "any irregularity in the proceedings before the Inquiry Panel and the Review Board ordinarily will not amount to a denial of due process, as long as the lawyer is given notice and an opportunity to defend in a full and fair hearing following the institution of disciplinary proceedings in this Court." *Id.* at 202, 528 A.2d at 897; *Attorney Grievance Comm'n v. Lee*, 387 Md. 89, 114, 874 A.2d 897, 912 (2005); *Attorney Grievance Comm'n v. Braskey*, 378 Md. 425, 442, 836 A.2d 605, 615–16 (2003). It is undisputed that respondent was given notice and an opportunity to defend in a hearing before Judge Wright on July 15, 2005, and before this Court on February 6, 2006. Therefore, we find no violation of respondent's due process rights.

■ Respondent's assertion that Maryland Rules 16–723 and 16–754(b) are unconstitutional is also without merit. As stated *supra*, respondent had the opportunity to defend herself in a full and fair hearing after the peer review process.

---

**16.** As noted by Judge Harrell, writing for the Court in *Attorney Grievance Commission v. Lee*, 387 Md. 89, 874 A.2d 897 (2005):

"A Conditional Diversion Agreement is an agreement, voluntarily entered into by Bar Counsel and the respondent attorney, that allows the attorney to avoid disciplinary sanctions if he or she acknowledges that he or she engaged in conduct that constitutes professional misconduct and agrees to appropriate remedial conditions, such as restitution, treatment of physical or mental conditions, specific legal education courses, and/or a public apology. Md. Rule 16–736. The Agreement must be approved by the Commission, and may be revoked if the respondent attorney fails to comply with the Agreement or engages in further conduct that would constitute professional misconduct. *Id.*"

387 Md. at 106 n. 18, 874 A.2d at 907 n. 18.

*See Lee,* 387 Md. at 114, 874 A.2d at 912 ("[A]ny concerns that a respondent attorney has been prejudiced by false statements made during the Peer Review process are ameliorated by the fact that the respondent attorney ultimately will have the opportunity to confront the complainant, under oath, at an evidentiary hearing.").

In the case *sub judice,* respondent is concerned about an alleged ex parte communication between Bar Counsel and the Peer Review Panel. She asserts that such ex parte communication influenced the Peer Review Panel to recommend the filing of public charges based upon a supposed erroneous allegation that she failed to agree to the Conditional Diversion Agreement. Respondent argues that the confidentiality imposed upon the proceedings via Maryland Rule 16–723 and Maryland Rule 16–754(b) makes the rules unconstitutional because it precludes her from introducing evidence from the peer review proceedings to support her argument.

Judge Harrell, writing for the Court in *Lee,* opined on the purpose of the peer review process:

"The purpose of the Peer Review process is to provide an open and frank environment in which the parties and complainant will feel comfortable to 'put it all on the table' in the hopes that they may be able to work, in an informal and cooperative manner, toward a mutually acceptable solution. This environment, however, is accomplished only by allowing both the respondent attorney and complainant the ability to make otherwise conciliatory or potentially inculpatory statements in seeking a mutual solution, without the fear that those statements may be used against him or her at a later hearing.

. . .

"Despite the common sense appeal of permitting use of statements made during the Peer Review process to expose later inconsistencies or intentional misrepresentations, we conclude that the better course is to declaim, borrowing and mutating somewhat a currently popular advertising slogan,

'what happens in Peer Review stays in Peer Review.' The comprehensive and sweeping language of Md. Rule 16–723(a) reflects our conclusion that the Peer Review process will only be effective if *all* statements made at a Peer Review Panel meeting are insulated from subsequent disclosure in the remaining stages of the attorney grievance process."

387 Md. at 112–13, 874 A.2d at 911. While *Lee* was concerned with the admissibility at an evidentiary hearing of statements made during the Peer Review process and not an ex parte communication, as in the case *sub judice*, the Court's reasoning is applicable in both instances.

Furthermore, it should be noted that all ex parte communications are not prohibited during the course of the Peer Review process. Maryland Rule 16–743(d) states:

"Except for administrative communications with the Chair of the Peer Review Committee and as allowed under subsection (c)(1) as part of the peer review meeting process, no member of the Panel shall participate in an ex parte communication *concerning the substance of the Statement of Charges* with Bar Counsel, the attorney, the complainant, or any other person." (Emphasis added.)

The Rule allows ex parte communication between the parties and the Peer Review Panel concerning subject matter *other* than the substance of the Statement of Charges. An ex parte conversation concerning whether or not respondent agreed to a Conditional Diversion Agreement does not concern the substance of the Statement of Charges.

For the aforementioned reasons these exceptions are denied.

### B. *Respondent's Exceptions to the Hearing Judge's Factual Findings.*

■ *Exceptions 3, 6, 7, 8, 9, 10 & 11:* Respondent filed exceptions to a number of Judge Wright's findings of fact which concerned respondent's failure to keep Mr. Schell sufficiently informed concerning the accrual of fees throughout the

course of the representation. These exceptions to Judge Wright's factual findings arise out of respondent's erroneous belief in a supposed contradiction in the hearing court's findings which respondent expresses as "the hearing judge's irreconcilable and contradictory factual finding that Mr. Schell received the monthly statements apprising him of his financial status even though they were not the expected detailed monthly statements, but rather were short statements apprising him of his fees."

In order to clarify the confusion raised by respondent's exceptions, it is necessary to reconcile what was actually said in the findings of fact and conclusions of law with respondent's interpretation. Judge Wright stated:

"The agreement called for the complainant, Mr. Schell, to pay all litigation costs. The agreement stated that Ms. Calhoun would provide monthly statements to her client after the Five Thousand Dollar retainer was depleted.

"Respondent, however, failed to provide the expected monthly statements. Now I know there is a conflict as to whether certain statements were, in fact, sent. Mr. Schell indicated he didn't receive anything until, I believe, March of 2003. Ms. Calhoun and her witness indicated that certain statements were, in fact, sent on a monthly basis.

"I am not making any finding of fact as to whether these statements were or were not sent. I'm assuming that they were sent. But they are certainly, again, not what would have been expected in any attorney/client relationship to meet the agreement or contractual definition of monthly statements.

"The control is in the hands of the attorney. And there is an expectation, I believe, that in this situation any monthly statements would have been detailed indicating fees earned, costs paid in furtherance of litigation as charges and then a statement as to monies paid by client, received by counsel to be applied to fees earned. That was not done. So there's a failure of Ms. Calhoun to provide the expected monthly detailed statements."

There is no "irreconcilable and contradictory factual finding" in Judge Wright's statement. The meaning is clear. Judge Wright, as the hearing judge, found that whether or not statements were actually sent was irrelevant. The statements which respondent asserted were sent were inadequate to satisfy respondent's responsibility to her client.[17] Respondent failed to keep Mr. Schell informed of the accrual of fees, misled him as to amounts owed, as to how she was applying payments, and as to how his settlement would be calculated in regards to any fees owed.

These exceptions are denied.

*Exception 4:* Respondent excepts to the hearing judge's finding that "[i]n April of 2000 Ms. Calhoun filed a charge of discrimination with the Equal Employment Opportunity Commission." [18] Respondent contends that the discrimination charge was filed on or about February 2000. The record contains a cover letter dated February 19, 2000, from respondent to the EEOC concerning the charging documents, however, in Mr. Schell's deposition he indicates that he signed the charging document on March 1, 2000, and mailed it to the EEOC on that same day. In any case, the exact date on

---

**17.** The record reflects that nineteen "statements" may have been sent by respondent to Mr. Schell from September 10, 2000, to August 9, 2002. The June 2001 and June 2002 statements are missing from the record and the December 2001 statement is consolidated with the January 10, 2002, statement, as are the May and July 2002 statements with the August 9, 2002, statement. These communications from respondent to Mr. Schell do not satisfy an attorney's responsibility to keep their client adequately informed. The majority of these letters are substantially identical in form, with the exception of dollar amounts. For example, the October 11, 2000, letter reads as follows:

"Dear Paul:
Please be advised that your fees for September are $165.00.
Very truly yours,
Candace K. Calhoun"

We agree with the hearing judge that there was "a failure of Ms. Calhoun to provide the expected monthly detailed statements."

**18.** Judge Wright most likely obtained the April date from a letter from respondent to Mr. Schell, dated April 26, 2000, which indicates that the EEOC claim was filed, but does not indicate the date on which it was filed.

which the EEOC claim was filed is not dispositive of this exception. Respondent began representation of Mr. Schell in May of 1999. Respondent did not file a claim with the EEOC until either February, March, or April of 2000. For the purpose of this case, whether respondent waited nine, ten, or eleven months to file the charge is inconsequential.

This exception is denied.

*Exception 5:* Respondent excepts to the hearing judge's finding that respondent "failed to interview or depose any potential witness." Respondent argues that she "secured numerous witness statements from Mr. Schell, that Mr. Schell had obtained in order to save him money." Respondent's contention does not dispute the hearing judge's statement. It is evident from the record that respondent did not interview any potential witnesses and the only deposition taken was of Mr. Schell.

This exception is denied.

*Exceptions 12 & 13:* Respondent excepts to the hearing judge's finding that "Ms. Calhoun failed to deposit those funds, which were settlement funds, that were for the benefit of her client, failed to deposit those funds in a proper attorney trust escrow account" and that respondent "co-mingled trust funds with personal funds." Respondent argues that the $8,000.00 settlement was for "fees earned" and therefore she could deposit the money into her "office account." [19] A review of the record shows that the settlement funds were not deposited into a proper trust account and were co-mingled with personal funds. We find Judge Wright's findings to be supported by clear and convincing evidence.

These exceptions are denied.

*Exceptions 14 & 15:* Respondent excepts to the hearing judge's finding that "Ms. Calhoun failed to promptly account for the funds received and failed to advise Mr. Schell in a

---

**19.** For the purposes of the disciplinary rules, respondent's "office account" is indistinguishable from a personal account.

timely manner that she had disbursed the settlement funds to herself" and that "it was not until March of 2003 after many requests by Mr. Schell that Ms. Calhoun finally informed Mr. Schell ... where the Eight Thousand Dollars went and what she was going to apply it to." Respondent again argues that these findings are factually incorrect because of the hearing judge's "irreconcilable and contradictory factual finding that Mr. Schell received monthly statements apprising him of his financial status even though they were not 'the expected detailed monthly statements,' but rather were short statements apprising him of his fees, except for one detailed statement received in June 2001" and that such statements show that respondent "did promptly account for the funds and advised Mr. Schell in a timely matter [sic] that the funds were disbursed to herself." We discussed *supra* the insufficiency of the monthly "statements" which respondent supposedly sent to Mr. Schell. In addition, the statements make no mention of the $8,000.00 settlement amount and any "detailed" statement received in June 2001 would not have covered the settlement funds, as such funds were received on or about February 20, 2002.

These exceptions are denied.

■ *Exception 16:* The hearing judge found that respondent "failed to keep Mr. Schell informed concerning the status of [the] litigation." Respondent takes exception to this finding based on the aforementioned monthly "statements" and a number of letters from respondent to Mr. Schell which are contained in the record, "including letters explaining that Respondent had not yet received the final document which dismissed the case." As we have discussed, the statements were insufficient to keep Mr. Schell properly informed of the status of the litigation. Judge Wright did not find that the additional letters were, on their own, sufficient to keep Mr. Schell properly informed concerning the status of the litigation. In fact, Judge Wright specifically found that the letters from respondent to Mr. Schell "explaining that Respondent had not yet received the final document which dismissed the case" were misrepresentations. Judge Wright stated:

"But then there is communication from Ms. Calhoun to her client, which I can only find is misrepresentative. Because ... then March thirty-one, 2002 Mr. Schell did receive a copy of a letter from Ms. Calhoun to Judge Legg and the letter advised Judge Legg that the parties have consummated the settlement.

"A note at the bottom of the page informs Schell, among other things, that the respondent received a final signed agreement which was sent on March twenty-seventh, 2002 and that she will do a final computation of fees and costs and expenses.

"As of May nine, 2002 Schell had not received an accounting from respondent. On or about May nine, 2002 Schell received another letter in response to his recent telephone call. This letter informed Schell that Ms. Calhoun has not received the dismissal from the Federal Court in regards to his case and that once she receives this notice respondent would send the final computation of his invoice.

"Respondent also informed Schell in this letter that the Court usually allows an additional thirty days before it officially dismisses the case. Those are facts that I would find. And they're just absolutely ... absolutely wrong to the extent that the Court had already dismissed the case. Ms. Calhoun knew that the Court had dismissed the case. And the Court didn't have anything to do after that."

We find Judge Wright's finding to be supported by clear and convincing evidence.

This exception is denied.

■ *Exception 17:* Respondent excepts to the hearing judge's finding that respondent "attempt[ed] to collect funds ... from Mr. Schell for which he was not responsible under the terms of the retainer agreement." Respondent argues that such finding is not sufficiently clear and specific to inform her of the allegation of a violation of MRPC 1.1 Competence.[20]

---

**20.** The evidence was not offered to prove a violation of MRPC 1.1, but rather MRPC 1.5 and 8.4.

However, respondent states that "[a]t the hearing, said allegation appeared to be that Respondent attempted to charge a late fee and interest due to Mr. Schell's failure to pay his bill. . . ." Respondent admitted this before the Circuit Court for Washington County on September 21, 2005, stating: "I did attempt to charge a late fee and interest because I assumed you could do so if a person did not pay his bill." Judge Wright's finding was sufficiently clear and convincing that respondent understood what conduct it referred to.

This exception is denied.

C. *Respondent's Exceptions to Conclusions of Law.*

■ *Exception 18:* Respondent excepts to the hearing judge's conclusion and finding that "the fees that were charged by way of this final March 2003 statement were excessive and unreasonable" and therefore violated MRPC 1.5. Respondent argues that, pursuant to Maryland Rule 16–709(c),[21] the Petition for Disciplinary or Remedial Action is not sufficiently clear and specific to inform her of the basis of the allegation that she charged excessive and unreasonable fees.

Judge Raker, writing for the Court, discussed the form of charges in *Attorney Grievance Commission v. Fezell,* 361 Md. 234, 760 A.2d 1108 (2000), stating:

"To be sufficient, a petition must be intelligible and sufficiently informative to allow an accused attorney to prepare a defense. *See Attorney Grievance [Comm'n] v. Alison,* 349 Md. 623, 641, 709 A.2d 1212, 1221 (1998) (holding that charges were sufficiently clear and specific to inform attorney of misconduct charged even though allegations did not specifically state that a cause of action was 'frivolous,' but merely cited the rule number and presented facts to support the allegation). So long as the petition informs the attorney

---

**21.** Maryland Rule 16–709(c) states:

"c. **Form.** The charges shall be in writing and shall be sufficiently clear and specific reasonably to inform the attorney proceeded against of any misconduct charged and of the basis of any allegation that he is incompetent."

of the misconduct charged in language which is clear and sufficiently specific to enable the attorney to prepare a defense, the charges need not be set out in any particular form. *See Bar Ass'n v. Cockrell*, 270 Md. 686, 692, 313 A.2d 816, 819 (1974) (holding that, while the [predecessor] rule requires that the charges be sufficiently clear and specific so as to enable the attorney to prepare a defense, no certain form or detail is required)."

*Fezell*, 361 Md. at 247, 760 A.2d at 1115.

In the case *sub judice*, the petition alleged:

"30. Respondent attempted to collect funds from the Complainant for which he was not responsible under the terms of the retained agreement.

"31. Respondent charged an excessive or unreasonable fee."

The petition then cited MRPC 1.5. Respondent contends that there must be specific factual allegations applied to the particular factors enumerated in MRPC 1.5 as to why the fee was excessive or unreasonable. That is not the case. No certain form or detail is required. *See Fezell*, 361 Md. at 247, 760 A.2d at 1115; *Cockrell*, 270 Md. at 692, 313 A.2d at 819. The petition's allegations informed respondent that she would have to prepare a defense as to why she attempted to collect funds, which were not provided for in the retainer agreement, from the complainant and that she would have to show that her charged fees were not excessive or unreasonable. That is sufficiently clear and specific to reasonably inform respondent, as required by Maryland Rule 16–709(c).

As to the conclusion of law itself, that respondent violated MRPC 1.5, Judge Wright found that the total fees charged in the case were unreasonable. Specifically, that respondent took advantage of Mr. Schell, that she built up $10,000.00 to $15,000.00 in fees and then recommended a small settlement that would only cover a portion of those fees, and that she was not productive for her client. These findings are supported by clear and convincing evidence in Judge Wright's findings of fact and conclusions of law.

Judge Wright found that respondent delayed in filing the complaint. The time line of events, according to respondent's own itemized final bill [22] is as follows: May 17, 1999, Representation begins; February 19, 2000, Filing of charging documents with EEOC; May 16, 2000, Receive right-to-sue letter from EEOC. The record indicates that the complaint itself was then filed with the United States District Court for Maryland on August 11, 2000. Almost ten months passed from the time respondent's representation of Mr. Schell began to when she filed the charging documents with the EEOC. Then, respondent waited two months after receiving the right-to-sue letter from the EEOC before filing the complaint. In all, somewhere around fifteen months passed from the beginning of representation to the filing of the complaint.

Respondent argues that this time period was reasonable. That she had to wait for the right-to-sue letter from the EEOC and that she "was waiting until an important same-sex harassment case was decided to determine the most effective way to proceed." There is no evidence in the record of any particular "important same-sex harassment case" and, while respondent did have to wait for a right-to-sue letter from the EEOC, she didn't have to wait ten months before filing a claim with the EEOC. Respondent's contention that she was pursuing a settlement prior to filing a claim with the EEOC does not negate Judge Wright's finding and conclusion.

Respondent also excepts to the hearing judge's factual finding that from the filing of the complaint, August 11, 2000, through August of 2001, "all that's done are extensions of discovery-stipulations, requests, stipulations, orders to extend discovery deadline." The record indicates that Mr. Schell's deposition was held on August 16, 2001. Respondent did not interview or depose any witnesses during the year that passed between the initial filing of the complaint and Mr. Schell's deposition. Respondent's contention that she was trying to obtain a settlement is unpersuasive. In addition, respondent

**22.** Respondent sent a "final computation" to Mr. Schell attached to a letter dated March 15, 2003.

alleged that she discovered at the deposition in August 2001 that Mr. Schell did not have a strong case, as he had been a participant himself in the complained about harassment. Yet, even with this information in hand, respondent continued to pursue the case and charge Mr. Schell fees until February 28, 2003.

This exception is denied.

*Exception 19:* Respondent excepts to the hearing judge's conclusion and finding that respondent violated MRPC 1.1, 1.3, 1.4, and 8.4(a), (c) and (d). Respondent also excepts to the hearing judge's finding that, although respondent did not engage in dishonest or fraudulent conduct, respondent did engage in conduct that was deceitful and misleading. Respondent fails to provide any new arguments for this exception other than those previously discussed and dismissed with the exception of her arguments involving MRPC 8.4(c).

Respondent states that:

"The hearing judge further concludes that Rule 8.4(c) was violated in that Respondent did not communicate properly and allegedly misrepresented the facts in regard to the document which dismissed the case in this matter. Specifically, the judge cites the January 22, 2002 document which states that the case is dismissed, but 'The entry of this order is without prejudice to the right of a party to move for good cause within thirty days to reopen if settlement is not consummated.'

"The judge then states: 'So it is a dismissal order without prejudice of a party to act to reopen if the settlement is not consummated. But the Court doesn't do anything more. It's the obligation of an attorney if the settlement's not consummated within thirty days to do something.' This statement infers that Respondent took no action to reopen the case because she had not received the settlement check; however, the record includes a Motion To Reopen filed by Respondent and Mr. Schell testified that he was aware the Motion To Reopen was filed."

However, what is being referred to in regards to the violation of MRPC 8.4(c) is that, irrespective of respondent filing a Motion to Reopen,[23] her conduct was deceitful and misleading. The record indicates that respondent received a check for $8,000.00, the full settlement amount, and deposited it into her personal bank account on February 20, 2002. Respondent then failed to properly apprise her client, Mr. Schell, regarding the settlement amount until a March 15, 2003, letter.

Respondent contends that Mr. Schell knew of the settlement from a March 31, 2002, communication in which she copied a letter sent to Judge Legg to Mr. Schell with a note at the bottom stating:

"Dear Pete:

Per the above, I received the final signed agreement which was sent on March 27, 2002 (although [opposing counsel] supposedly signed it on 2/21/02;) therefore, the conference above is no longer necessary. Please be advised that I will do a final computation of your fees and costs and expenses. (see enclosed agreement)

Very truly yours,

Candace K. Calhoun"

The final computation was not sent to Mr. Schell until the March 15, 2003, letter. Respondent argues that this was because she had not received an order dismissing the case. Respondent continued to charge Mr. Schell for representation through February 28, 2003. We do not find the argument concerning the dismissal persuasive. Respondent held her client's settlement money for over a year before providing a full accounting of the costs involved in the litigation and of the settlement amount.

---

**23.** The record indicates that an order dismissing the case was issued on January 22, 2002, "without prejudice to the right of a party to move for good cause within 30 days to reopen th[e] action if settlement is not consummated." On February 19, 2002, within 30 days, respondent filed a Motion to Reopen. On March 11, 2002, the court issued an order reopening the case, and on August 6, 2002, the case was dismissed as moot due to the consummation of the settlement.

This exception is denied.

*Exception 20:* Respondent excepts to the hearing judge's finding and conclusion that respondent violated MRPC 1.15 by not depositing the second $5,000.00 received from Mr. Schell into "a properly designated attorney trust account." Respondent argues that the account was a trust account, but was just not properly labeled. It is her contention that because she was not charged under Maryland Rule 16–606,[24] it would be a violation of her due process rights to hold her responsible for the violation. This is an erroneous argument. MRPC 1.15(a) clearly states that "[f]unds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules," which includes Maryland Rule 16–606.

This exception is denied.

*Exception 21:* Respondent also excepts to the hearing judge's finding and conclusion that respondent failed to deposit the $8,000.00 in settlement funds into a trust account, and co-mingled the funds with personal funds, both violations of MRPC 1.15. Respondent contends that the settlement funds were for fees earned and, thus, do not fall under MRPC 1.15. This contention is without merit.

MRPC 1.15(b) specifically states that "[u]pon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person" and subsection (c) states that "[w]hen in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an

---

**24.** Maryland Rule 16–606, entitled "Name and designation of account," states:

"An attorney or law firm shall maintain each attorney trust account with a title that includes the name of the attorney or law firm and that *clearly designates the account as 'Attorney Trust Account', 'Attorney Escrow Account', or 'Clients' Funds Account' on all checks and deposit slips.* The title shall distinguish the account from any other fiduciary account that the attorney or law firm may maintain and from any personal or business account of the attorney or law firm." (Emphasis added.)

accounting and severance of their interests." In the case *sub judice* respondent failed to promptly notify Mr. Schell upon receiving the $8,000.00 in settlement funds and then deposited the funds to her personal bank account when Mr. Schell arguably had an interest in the funds.

This Court discussed the test for evaluating an attorney's entitlement to funds in *Attorney Grievance Commission v. Braskey*, 378 Md. 425, 836 A.2d 605 (2003), in which we stated:

"In *Attorney Grievance Commission v. Culver*, 371 Md. 265, 808 A.2d 1251 (2002), this Court held that an attorney violated Rule 16–607(b)(2) [25] by removing from an escrow account money to which he believed he was entitled. We rejected the attorney's argument that he had not violated the Rule because he believed, based on his understanding of the fee agreement with his clients, that he was entitled to the funds. We noted as follows:

"The test, however, is not whether, when examining the circumstances objectively, one would conclude that respondent was legally entitled to the amount claimed; rather the test should be whether there was in fact a fee disagreement between the parties concerning respondent's entitlement to the amount withdrawn at the time of the withdraw. The rule is unambiguous: an attorney may not withdraw a portion of the deposited funds when the attorney's right to receive that portion is 'disputed' by the client."

---

**25.** "Both Rule 1.15(c) and Rule 16–607(b)(2) deal with the prohibition on an attorney's withdrawal of disputed client funds. Rule 16–607(b)(2) provides:

"An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved."

In *Attorney Grievance Comm'n v. Culver*, 371 Md. 265, 269, 808 A.2d 1251, 1253 (2002), the hearing judge concluded that Rule 1.15(c) overlapped with Rule 16–607(b)(2) and that a finding of violation of the latter rule only was more appropriate." *Braskey*, 378 Md. at 449 n. 10, 836 A.2d at 620 n. 10.

*Culver,* 371 Md. at 275–76, 808 A.2d at 1257 (quoting *In re Haar,* 667 A.2d 1350, 1353 (D.C.1995)). The *Haar* court further noted that the dispute need not be "genuine," "serious," or "bona fide." *Id.* Moreover, the court noted that "the word 'dispute' means 'to argue about; to debate; to question the truth or validity of; [or] to doubt.' *The American Heritage Dictionary* 380 (1976). *Id.* The test as to whether the Rule is violated is an objective one, *i.e.,* whether there was in fact a dispute regarding the funds. *An attorney's subjective belief that he or she is legally entitled to the fee is irrelevant. Nor is it relevant that the attorney is legally entitled to the fee if there is a dispute as to the fee.* An erroneous belief that one is entitled to a *disputed* fee may be a mitigator with respect to an appropriate sanction to be imposed but it is not relevant to the determination as to whether the Rule is violated."

*Braskey,* 378 Md. at 449–50, 836 A.2d at 620 (some emphasis added). Numerous letters in the record establish a disagreement or dispute as to respondent's entitlement to the settlement funds. Therefore, respondent should have deposited the funds into a proper trust account pending resolution of such dispute.

This exception is denied.

We find that the hearing judge's findings of fact are not clearly erroneous and our *de novo* review of the record supports and affirms that the hearing judge's conclusions of law are supported by those facts.

 In sum, we find that respondent is responsible for violations of all the charges alleged by Bar Counsel with the exception of MRPC 8.1. Respondent violated MRPC 1.1 and 1.3 by failing to exhibit competence and diligence in pursuing the litigation efficiently and within a reasonable time period. MRPC 1.4 was violated by respondent's failure to communicate effectively with Mr. Schell concerning the settlement as well as by respondent's inadequate monthly statements. Respondent violated MRPC 1.5 by attempting to charge interest and penalty fees to Mr. Schell which were not in his represen-

tation agreement as well as building up excessive fees through her delaying of the litigation. MRPC 1.15 was violated by respondent's failure to properly label her trust account and the deposit of the two $5,000.00 payments into that account and, especially, by respondent's deposit of Mr. Schell's $8,000.00 settlement check into respondent's personal checking account. MRPC 8.4(a) was violated by respondent's conduct in regards to the other charges. MRPC 8.4(c) was violated because of respondent's deceit and misrepresentation in communications with Mr. Schell concerning the settlement funds. Furthermore, respondent's conduct was prejudicial to the administration of justice in violation of MRPC 8.4(d). Finally, Rule 16–609 was also violated by respondent's treatment of Mr. Schell's settlement funds.

## SANCTION

In deciding what is the appropriate sanction for a violation of the MRPC we look to, and evaluate, the particular facts and circumstances of the case before us, considering any mitigating factors. *See Attorney Grievance Comm'n v. Cherry–Mahoi*, 388 Md. 124, 160, 879 A.2d 58, 80 (2005); *Zuckerman*, 386 Md. at 375, 872 A.2d at 713. The overarching purpose of disciplinary proceedings is to protect the public rather than to punish the attorney who erred. *Attorney Grievance Comm'n v. Wallace*, 368 Md. 277, 289, 793 A.2d 535, 542 (2002); *Attorney Grievance Comm'n v. Franz*, 355 Md. 752, 760–61, 736 A.2d 339, 343–44 (1999). As we stated in *Franz:*

> "The public interest is served when this Court imposes a sanction which demonstrates to members of the legal profession the type of conduct that will not be tolerated. *Attorney Griev. Comm'n v. Kerpelman*, 288 Md. 341, 382, 420 A.2d 940, 959 (1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1492, 67 L.Ed.2d 621 (1981). By imposing such a sanction, this Court fulfills its responsibility 'to insist upon the maintenance of the integrity of the Bar and to prevent the transgression of an individual lawyer from bringing its image into disrepute.' *Maryland St. Bar Ass'n v. Agnew,*

271 Md. 543, 549, 318 A.2d 811, 814 (1974). Therefore, the public interest is served when sanctions designed to effect general and specific deterrence are imposed on an attorney who violates the disciplinary rules. *See* [*Attorney Grievance Comm'n v.*] *Protokowicz*, 329 Md. [252,] 262–63, 619 A.2d [100,] 105 [ (1993) ]; *Attorney Griev. Comm'n v. Owrutsky*, 322 Md. 334, 355, 587 A.2d 511, 521 (1991); *Attorney Griev. Comm'n v. Alison*, 317 Md. 523, 540–41, 565 A.2d 660, 668 (1989). . . . The attorney's prior grievance history, as well as facts in mitigation, constitutes part of those facts and circumstances. *Maryland State Bar Ass'n v. Phoebus*, 276 Md. 353, 362, 347 A.2d 556, 561 (1975)."

*Franz*, 355 Md. at 760–61, 736 A.2d at 343–44; *Attorney Grievance Comm'n v. Tinsky*, 377 Md. 646, 653–54, 835 A.2d 542, 546–47 (2003); *Wallace*, 368 Md. at 289, 793 A.2d at 542.

Bar Council argues that "[t]hroughout her representation of [Mr.] Schell, Respondent engaged in conduct laced with dishonesty and breach of trust" and recommends that respondent be disbarred for violating MRPC 1.1, 1.3, 1.4, 1.5, 1.15, 8.4(a), (c), (d) and Maryland Rule 16–609. Respondent requests that this action be dismissed or, in the alternative, a public reprimand be issued.

In determining the appropriate sanction, we note that while the hearing judge did find that respondent violated MRPC 8.4(c), he did not find specifically that respondent engaged in dishonest or fraudulent conduct. The actual colloquy between Bar Counsel and the hearing judge occurred after the discussion of the specific MRPC violations and consisted of the following:

"[Bar Counsel:] I did have a question about 8.4 C. That was the engage in conduct involving dishonesty, fraud, deceit and misrepresentation. You indicated that 8.4 was violated and you mentioned Section D. But I didn't . . . at least I didn't hear Section C.

THE COURT: Well it was engaging in conduct that was, I think, deceitful and misrepresentative, not dishonest, not fraud. And the areas of be[ing] deceitful or misrepresenta-

tion go to, again, the communication or lack of communication or type of communication and the relationship between client and attorney."

The central issue that we must consider in determining whether disbarment is the appropriate sanction in this case is respondent's treatment of the $8,000.00 in settlement funds.

██ We stated in *Culver*:

"It is not the finding of effective dishonesty, fraud or misappropriation, however, that is essential to our determination whether disbarment is the appropriate sanction, but rather the attorney's intent. 'The gravity of misconduct is not measured solely by the number of rules broken but is determined largely by the lawyer's conduct.' [*Attorney Grievance Comm'n v.*] *Briscoe,* 357 Md. [554,] 568, 745 A.2d [1037,] 1044 [ (2000) ] (citing *Attorney Grievance Comm'n v. Milliken,* 348 Md. 486, 519, 704 A.2d 1225, 1241 (1998) citing *Flint's Case,* 133 N.H. 685, 582 A.2d 291, 293 (1990)). We elaborated on this point in [*Attorney Grievance Comm'n v.*] *Hayes,* where we stated:

"That the effect of the respondent's action may be to misappropriate funds belonging to another, as in *Attorney Griev. Comm'n v. Bernstein,* 363 Md. 208, 221, 768 A.2d 607, 614 (2001), does not mean that the actions were taken with the intent to misappropriate. Similarly, this is the case with respect to the finding of no personal enrichment and the respondent's knowledge of the Rules of Professional Conduct. Clearly, one who acts with deliberation and calculation, fully cognizant of the situation and, therefore, fully intending the result that is achieved is more culpable than one who, though doing the same act, does so unintentionally, negligently or without full appreciation of the consequences."

367 Md. [504,] 514, 789 A.2d [119,] 127 [ (2002) ] (quoting [*Attorney Grievance Comm'n v.*] *Jeter,* 365 Md. [279,] 289, 778 A.2d [390,] 395 [ (2001) ] ).[26]"

---

**26.** *"See also* dissenting opinion of Judge Wilner in *Attorney Grievance Comm'n v. Bernstein,* 363 Md. 208, 231, 768 A.2d 607, 619–20 (2001)

*Culver,* 371 Md. at 280–81, 808 A.2d at 1260 (footnote omitted). In addition, Judge Battaglia, writing for the Court in *Zuckerman,* opined:

"We have held that the sanction for misappropriation of client funds is disbarment absent compelling extenuating circumstances justifying a lesser sanction, *see [Attorney Grievance Comm'n v.] James,* 385 Md. [637,] 665–66, 870 A.2d [229,] 246 [ (2005) ]; *Attorney Grievance v. Sperling,* 380 Md. 180, 191–92, 844 A.2d 397, 404 (2004); *Attorney Grievance Comm'n v. Smith,* 376 Md. 202, 237, 829 A.2d 567, 588 (2003); *Attorney Grievance Comm'n v. Spery,* 371 Md. 560, 568, 810 A.2d 487, 491–92 (2002); *Attorney Grievance Comm'n v. Vanderlinde,* 364 Md. 376, 410, 773 A.2d 463, 483 (2001); however, '[w]here there is no finding of intentional misappropriation . . . and where the misconduct did not result in financial loss to any of the respondent's clients, an indefinite suspension ordinarily is the appropriate sanction.' *Sperling,* 380 Md. at 191–92, 844 A.2d at 404 (quoting *Attorney Grievance Comm'n v. DiCicco,* 369 Md. 662, 687, 802 A.2d 1014, 1028 (2002)); *see also Attorney Grievance Comm'n v. Seiden,* 373 Md. 409, 424–25, 818 A.2d 1108, 1117 (2003); *Attorney Grievance Comm'n v. Jeter,* 365 Md. 279, 293, 778 A.2d 390, 398 (2001); *Awuah I,* 346 Md. at 435–36, 697 A.2d at 454. In this regard we have stated,

> The co-mingling of client and attorney funds always creates the potential for misappropriation, even when there is no intent to misappropriate. A misappropriation necessarily occurs whenever the attorney withdraws funds from a co-mingled account for his or her own purpose and, as a result, leaves the account insufficient to cover all client funds, and such a misappropriation is never innocent. It is not necessarily wilful, however, or for the conscious purpose of unlawfully taking funds held in trust for another.

> *See also Attorney Grievance Comm'n v. Adams,* 349 Md. 86, 98–99, 706 A.2d 1080, 1086 (1998) (holding that a 30–day suspension is the appropriate sanction where the respondent did not intentionally misuse the funds of the client); *Attorney Grievance Comm'n v. Drew,* 341 Md. 139, 154, 669 A.2d 1344, 1351 (1996) (holding that absent clear and convincing evidence showing intentional misappropriation, the failure to properly keep property in an escrow account warranted suspension as opposed to disbarment)." *Culver,* 371 Md. at 281 n. 19, 808 A.2d at 1260 n. 19.

'Although ignorance does not excuse a violation of disciplinary rules, a finding with respect to the intent with which a violation was committed is relevant on the issue of the appropriate sanction. This is consistent with the purpose of a disciplinary proceeding....' *Spery,* 371 Md. at 568, 810 A.2d at 491–92[ (]quoting *Attorney Grievance Comm'n v. Awuah* [*I* ], 346 Md. 420, 435, 697 A.2d 446, 454 (1997)[) ]." *Zuckerman,* 386 Md. at 376, 872 A.2d at 714. The hearing judge did not find that respondent's conduct was intentionally fraudulent. The facts indicate that respondent may have believed that the settlement funds were due her as fees owed for representation. While respondent's belief in respect to the issue of dishonesty may be erroneous, under these circumstances it is her intent that we primarily evaluate.

■■■ This Court does not take the mishandling of attorney trust accounts lightly. As we stated in *Attorney Grievance Commission v. Sheridan,* 357 Md. 1, 31, 741 A.2d 1143, 1159 (1999):

"We cannot understate the importance of holding funds in escrow in accordance with Rule 1.15 and how the Rule reinforces the public's confidence in our legal system. Escrow accounts serve as sanctuary for client funds from the attorney's creditors. *See* [*Attorney Grievance Comm'n v.*] *Webster,* 348 Md. [662,] 677, 705 A.2d [1135,] 1143–44 [ (1998) ]. They also provide peace of mind and order to disputing parties, assuring that no one party will exercise control over the funds until an independent resolution of the dispute."

We have, however, found the sanction of indefinite suspension to be appropriate in cases with MRPC violations similar to the case *sub judice.*

In particular, in *Sheridan,* where the respondent had violated MRPC 1.15(a), (b), (c) and 8.4(c), we held that indefinite suspension with the right to reapply after one year was the appropriate sanction. 357 Md. at 35, 741 A.2d at 1162. In *Sheridan,* the attorney, acting on a collections claim, achieved a settlement for his client. Pursuant to the settlement, funds

would be remitted to Sheridan, for his client, on a monthly basis. Sheridan failed to notify his client of the settlement or the funds received up to that point. The settlement funds at issue were not deposited into an escrow account and Sheridan admitted that he used them on professional and personal expenditures. The hearing judge found that Sheridan truly believed the money was his for attorney's fees and that he did not act to intentionally defraud his client. As a result of the hearing judge's finding, we found that Sheridan's conduct did not warrant disbarment. *Id.* at 35–36, 741 A.2d at 1161–62.

A number of other cases have found indefinite suspension of varying degrees to be the proper sanction where there was no finding of intentional misappropriation. *See Sperling,* 380 Md. 180, 844 A.2d 397 (finding violations of MRPC 1.15 and 8.4(a); indefinite suspension with right to reapply after ninety (90) days); *Attorney Grievance Comm'n v. McClain,* 373 Md. 196, 817 A.2d 218 (2003) (finding violations of MRPC 1.15 and Rule 16–606; ordered a thirty (30) day suspension); *Culver,* 371 Md. 265, 808 A.2d 1251 (finding violations of MRPC 1.5(c), 1.15(c) and Rule 16–607(b)(2); indefinite suspension with right to reapply after thirty (30) days); *Dicicco,* 369 Md. 662, 802 A.2d 1014 (finding violations of MRPC 1.15(a), (c), 8.4(a), Rules 16–607(a) and 16–609; indefinite suspension with right to reapply after ninety (90) days); *Jeter,* 365 Md. 279, 778 A.2d 390 (finding violations of MRPC 1.5, 1.15, and Maryland Rules 16–603 and 16–604; indefinite suspension with right to reapply after six months); *see also Zuckerman,* 386 Md. at 376–78, 872 A.2d at 714–15.

Respondent did violate MRPC 8.4(c), which often constitutes grounds for disbarment. Because, however, the hearing judge specifically found that respondent's conduct was not intentionally fraudulent we shall impose a lesser sanction. We note that the charges in the case *sub judice* arise only out of a single incident and that no prior history of disciplinary action against the respondent has been brought to the Court's attention.

Upon consideration of all the circumstances extant in the case *sub judice*, we find that respondent's conduct warrants an indefinite suspension from the practice of law.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–515(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST CANDACE K. CALHOUN.**